UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LOUIS PAUL DAIGLE                    CIVIL ACTION NO. 6:16-cv-01445

VERSUS                               JUDGE TRIMBLE

U.S. COMMISSIONER,                   MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Louis Paul Daigle, fully exhausted his administrative remedies

before filing this action in federal court.   The claimant filed an application for

disability insurance benefits ("DIB"), alleging disability beginning on December 12,

2014.[1]  His application was denied.[2]  The claimant requested a hearing, which was

held on April 12, 2016 before Administrative Law Judge Thomas Henderson.[3]  The

---

[1]      Rec. Doc. 7-1 at 169.

[2]      Rec. Doc. 7-1 at 60.

[3]      Rec. Doc. 7-1 at 40-58.

ALJ issued a decision on April 29, 2016,[4] concluding that the claimant was not disabled within the meaning of the Social Security Act from December 12, 2014 through the date of the decision.  The claimant asked for review of the decision, but the Appeals Council concluded that there was no basis for review of the ALJ's decision.[5]    Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on October 26, 1960.[6]   At the time of the ALJ's decision, he was fifty-five years old.  He graduated from high school and obtained some vocational training.[7]  He has relevant work experience as a purchasing agent and cost estimator in the oil and gas industry.[8]  He alleged that he has been disabled since December 12, 2014[9] due to major depressive disorder, post traumatic stress

---

[4]    Rec. Doc. 7-1 at 20-34.

[5]    Rec. Doc. 7-1 at 4.

[6]    Rec. Doc. 7-1 at 61.

[7]    Rec. Doc. 7-1 at 42.

[8]    Rec. Doc. 7-1 at 262.

[9]    Rec. Doc. 7-1 at 61, 198.

disorder, cyclothymic disorder, dysthymic disorder, borderline personality disorder, and anxiety.[10]

The claimant has been treating with psychiatrist Dr. David Dawes since 2005.[11]

In December 2013, the claimant was also treating with Terry T. Judice, a licensed clinical social worker.[12]

The claimant saw Dr. Dawes on April 28, 2014.[13]  He had changed jobs and reported having normal amounts of worry and anxiety.  He stated that he was compliant with his medications and found them to be effective.  Dr. Dawes diagnosed the claimant with Major Depression, Recurrent, Mild and Generalized Anxiety Disorder.  He continued the claimant's prescriptions of Prozac and Valium and advised him to return in six months.

The claimant again saw Dr. David Dawes on October 27, 2014.[14]  Dr. Dawes noted that the claimant had a frowning affect but made good eye contact and spoke spontaneously and elaboratively.  The claimant had lost his job, and he reported tension in his relationship with his partner.  Dr. Dawes's diagnosis was Generalized

---

[10]    Rec. Doc. 7-1 at 61.

[11]    Rec. Doc. 7-1 at 314-317.

[12]    Rec. Doc. 7-1 at 281.

[13]    Rec. Doc. 7-1 at 290.

[14]    Rec. Doc. 7-1 at 289.

Anxiety Disorder.  He continued the claimant's prescriptions of Prozac and Valium, and instructed the claimant to resume psychotherapy with the therapist of his choice and to return to see Dr. Dawes in six months.

The claimant saw Dr. Lyle LeCorgne, a clinical psychologist, on four occasions in November and December 2014 for depression and anxiety.[15]  During this time period, the claimant was fired from his job.  On November 8, 2014, Dr. LeCorgne administered a personality assessment inventory,[16] which Dr. LeCorgne interpreted as supporting diagnoses of Major Depressive Disorder, Single Episode, Unspecified.

The claimant returned to Dr. Dawes on January 19, 2015.[17]  He reported that he had lost his job in December 2014 because he fell asleep at his desk and had forgotten things he was told repeatedly.  He reported that he could no longer afford to see Dr. LeCorgne.  His relationship with his partner remained tense, and he reported having frequent suicidal thoughts without actually attempting suicide.  Although his eye contact was good, he had a frowning affect.  The diagnoses were Major Depression, Recurrent, Severe without Psychosis and Generalized Anxiety Disorder.  Dr. Dawes continued the claimant's Prozac and Valium and advised a

---

[15]    Rec. Doc. 7-1 at 277-278.

[16]    Rec. Doc. 7-1 at 303-312.

[17]    Rec. Doc. 7-1 at 342.

return visit in four weeks.  He also advised the claimant to go the nearest emergency room and call him if his suicidal thoughts intensified.

The claimant again saw Dr. Dawes on February 16, 2015.[18]  He was still not working and therefore was no longer worried about someone at work finding out that he was gay and causing him to lose his job.  His relationship with his partner was improved.  He felt less pressure, less worry, and less depression.  The diagnoses were Major Depression, Recurrent, Moderate and Generalized Anxiety Disorder.  The same medications were continued, and he was advised to return in two months.

On April 10, 2015, Dr. LeCorgne filled out a mental disorder questionnaire form, stating that the claimant described his symptoms as including anxiety, apprehension, foreboding of doom, impulsivity, fear of abandonment, avoidance behaviors, low frustration tolerance, poor sense of identity, and extreme self-doubt, which began with his being bullied in elementary school.  The claimant gave a history of having been hospitalized for eight weeks in 2001 due to severe depression and anxiety, with subsequent treatment with psychiatrist Dr. Dawes.  Dr. LeCorgne noted that the claimant was neat in appearance, and his speech was coherent but his mood was depressed.  He denied hallucinations or delusional ideation but admitted intermittent suicidal ideation. Dr. LeCorgne observed extremely low self-esteem with

---

[18]        Rec. Doc. 7-1 at 287.

self-loathing.  The claimant appeared suspicious and guarded, with paranoid-like mentation, and his moods changed suddenly.  Dr. LeCorgne noted that the claimant had no difficulty with activities of daily living but was distractable and had poor attention and concentration.  The claimant reported that his social functioning had never been good, that he felt like an outcast, and was prone to being confrontational with others.  The claimant also stated that his symptoms had intensified over the past six months.  The claimant reported that he had a history of not adapting well to work conditions, and he often reacted by quickly seeking other employment.  He indicated that he was highly intolerant of work place politics and did not accept criticism well.  Dr. LeCorgne diagnosed the claimant with Dysthymic Disorder and Generalized Anxiety Disorder.  The claimant was taking Prozac, Valium, and other medications.  Dr. LeCorgne advised that he continue on his medications and that he should have psychotherapy, although the claimant said he could not afford it at that time.  Dr. LeCorgne stated that the claimant's overall prognosis was guarded.

On April 20, 2015, the claimant again saw Dr. Dawes.[19]  His affect was blunted, but his eye contact was good.  He still has not working, and he described himself as "a big bundle of nerves."  He had a sore throat and was convinced that he had throat cancer.  He also stated that he had issues that need to be addressed.  He

---

[19]     Rec. Doc. 7-1 at 324.

denied suicidal ideation.  Dr. Dawes diagnosed Major Depression, Recurrent, Moderate and Generalized Anxiety Disorder (which Dr. Dawes characterized as worse).  Dr. Dawes continued the claimant's Prozac prescription, increased his Valium dosage, instructed him to continue psychotherapy with Dr. LeCorgne, and advised him to return in two months.

On June 15, 2015, the claimant again saw Dr. Dawes.[20]  Dr. Dawes noted that the claimant had a blunted, frowning affect but spontaneous, elaborative speech.  He was still unemployed and worried about losing his house.  He told Dr. Dawes that he contemplated suicide but would not act on it now because of a lack of burial insurance.  He also reported stomach problems due to taking Prozac.  Dr. Dawes discontinued the Prozac prescription, continued Valium, and started Effexor.  He diagnosed Major Depression, Recurrent, Severe, without Psychosis and Generalized Anxiety Disorder.  Dr. Dawes also discussed the possibility of hospitalization with the claimant, but the claimant did not want to be hospitalized at that time, stating that he was not imminently suicidal.  The claimant agreed to call Dr. Dawes or go to an emergency room in the event that suicide was imminent.  Dr. Dawes advised him to seek psychotherapy and to return in six weeks.

---

[20]     Rec. Doc. 7-1 at 323.

On June 17, 2015, Dr. Dawes filled out a Medical Source Statement.[21] He stated that he began treating the claimant in April 2005, and was continuing to see him bi-monthly. His current diagnoses were Major Depression, Recurrent, Severe without Psychosis and Generalized Anxiety Disorder, as well as Borderline Personality Traits. He assigned a current Global Assessment of Functioning ("GAF") score of 50 and a GAF score of 60 over the past year.[22] He stated that the claimant's prognosis was fair. In the statement, Dr. Dawes rated the claimant's functionality in several categories. In the category of "understanding and memory," he noted that the claimant had no functional deficit in three sub-categories and mild difficulties in two sub-categories. In the category of "concentration and persistence," Dr. Dawes noted that the claimant had mild deficits in two sub-categories and moderate deficits in three sub-categories. In the category of "social interaction," Dr. Dawes rated the

---

[21]        Rec. Doc. 7-1 at 314-317.

[22]        The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the 41 to 50 range indicates "serious symptoms" such as suicidal ideation and any serious impairment in social, occupational, or school functioning such as the inability to keep a job. A GAF score in the 51 to 60 range indicates "moderate symptoms" such as flat affect, circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning such as conflicts with peers or coworkers. The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

claimant as mildly impaired in one sub-category, moderately impaired in two sub-categories, and markedly impaired in three sub-categories.  In particular, he noted marked impairment in the ability to interact appropriately with the general public, marked impairment in the ability to work in coordination with or proximity to others without being unduly distracted by them, and marked impairment in the ability to accept instructions and respond appropriately to criticism from supervisors.  In the category of "adaptation and judgment," Dr. Dawes indicated that the claimant had no impairment in one sub-category, mild impairment in three sub-categories, and marked impairment in two sub-categories.  In particular, he noted that the claimant had marked impairment in the ability to respond appropriately to changes in the work setting and marked impairment in the ability to tolerate normal levels of work-place stress.  Dr. Dawes opined that the claimant's psychological symptoms would routinely interfere with his ability to maintain attention to simple, routine tasks one day out of a five-day work week and further opined that the claimant would likely miss five days of work each month because of his mental impairments or treatment.

The claimant saw Dr. Dawes again on July 27, 2015.[23]  The claimant reported to Dr. Dawes that the Effexor was working and that seeing a therapist was helpful. He denied current suicidal thoughts.  Dr. Dawes continued the Effexor and Valium

---

[23]        Rec. Doc. 7-1 at 322.

prescriptions and advised the claimant to return in two months.  His diagnoses were Major Depression, Recurrent, Mild and Generalized Anxiety Disorder.

On September 21, 2015, the claimant again saw Dr. Dawes,[24] reporting that he was "all right. . . for the most part" but also reporting a few panic attacks over the past two months, including one during an argument with his partner.  He was also discouraged about his inability to find a job and had gained weight.  Dr. Dawes continued his medications, advised him to return in three months, and diagnosed him with Major Depression, Recurrent, Mild, and Generalized Anxiety Disorder.

The claimant saw a psychotherapist, Dr. Douglas DeMahy, on January 4, 2016.[25]  The claimant told Dr. DeMahy that he does not enjoy life, that he had panic disorders in the past that were improved with medication, and discussed his sexual orientation, his mother's recent death, and his upbringing.  Dr. DeMahy noted that there was a question of borderline personality disorder.

The claimant again saw Dr. DeMahy on January 12, 2016.[26]  They discussed the claimant's self-doubt and his assertive, sometimes intolerant manner, particularly as they related to his having been recently fired.

---

[24]    Rec. Doc. 7-1 at 321.

[25]    Rec. Doc. 7-1 at 332.

[26]    Rec. Doc. 7-1 at 331.

When the claimant returned to see Dr. Dawes on January 18, 2016,[27] he reported that he had found a job in November but was fired in January due to often making simple mistakes.  He was seeing a urologist for prostate problems.  He was also seeing Dr. Douglas DeMahy for psychotherapy.  He reported insecurity when his partner was out of town, recent suicidal ideation, and feelings of inadequacy and unworthiness.  He stated that he had lost interest in things and was isolating himself.  Dr. Dawes discontinued his Valium and started him on Klonopin, and he increased the Effexor dosage.  He diagnosed Major Depression, Recurrent, Moderate and Generalized Anxiety Disorder.  He advised a follow-up visit in two months.

The claimant saw Dr. DeMahy again on January 19, 2016.[28]  They discussed the claimant's relationship with his mother, his upbringing, his having been teased at school, and his fear of abandonment.  The claimant returned to Dr. DeMahy on February 4, 2016, February 17, 2016, and March 17, 2016.[29]

On March 4, 2016, the claimant was evaluated by Dr. Naomi L. Friedberg, a psychologist, for a mental status examination.[30]  In preparation for the evaluation, she

---

[27]    Rec. Doc. 7-1 at 320.

[28]    Rec. Doc. 7-1 at 333.

[29]    Rec. Doc. 7-1 at 329-330.

[30]    Rec. Doc. 7-1 at 334-338.

reviewed treatment notes from Dr. Dawes and Dr. LeCorgne as well as the May 2015 Disability Determination Explanation.  She observed that the claimant was cooperative during the interview but that his mood and affect were flat and blunted. His displayed distress when discussing his family history and the things that allegedly prevent him from functioning well and working.  He complained about medical problems that complicate and exacerbate his depression, anxiety, and social skills deficits.  The claimant reported that he had experienced mental health issues since early childhood and had sought mental health treatment for twenty years.  He admitted to frequent suicidal ideation, stated that there was little happiness in his life, and reported that he often feels hostile and in a rage as well as in a panic and fearful with irrational thoughts.  He described ongoing difficulties in his interpersonal relationships, particularly on the job and with his partner.  Dr. Friedberg diagnosed the claimant with Major Depressive Disorder, Recurrent, Severe, without psychotic features; Generalized Anxiety Disorder; and Other Specified Personality Disorder, with Borderline Traits.  She noted that the claimant's ability to understand, remember, and carry out tasks is intact at times.  However, based on a review of his employment history, his long-term psychological history, and his social history, she opined that "there are more periods of time when [the claimant] is significantly debilitated in his ability to adequately adaptively function and maintain employment."  Further, she

stated that "[t]hese periods of time when he is not functional seem to be more intense and prolonged as he gets older, and as his medical problems worsen." She noted that his mood and affective disorders negatively impacted his ability to maintain attention to perform his work and that his difficulty in getting along with others has often led to his losing his job. She opined that "his reported limitations to tolerating the stress and pressure of day-to-day work activity and demands are. . . a product of his depression, anxiety, panic attacks, personality disorder, and reported medical dysfunction."

On April 12, 2016, the claimant testified at a hearing regarding his symptoms and his medical treatment. He testified that he does housework, some yard work, drives, and occasionally cooks. He described having been fired from two jobs (in January 2016 and December 2014) for failing to learn, failing to follow directions and procedures, and failing to comprehend details. He stated that, as he has aged, he has had increasing difficulty coping with anxiety and depression and getting along with others. He described his intolerance for office politics, his problems managing anger and rage, and how his thoughts about his emotions or worries interfere with his ability to focus and concentrate on his work. As noted in the plaintiff's briefing, he had difficulty staying on topic while testifying.[31]

---

[31]    Rec. Doc. 10 at 6.

The claimant now seeks to have the ALJ's finding of non-disability overturned.

**ANALYSIS**

**A.    STANDARD OF REVIEW**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[32]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[33]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[34]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[35]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence

---

[32]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[33]      *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[34]      *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[35]      42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

or substituting its judgment for that of the Commissioner.[36]    Conflicts in the evidence[37] and credibility assessments[38] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[39]

## B.    ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[40]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

---

[36]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[37]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[38]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[39]    *Wren v. Sullivan*, 925 F.2d at 126.

[40]    See 42 U.S.C. § 423(a).

-15-

for a continuous period of not less than twelve months."[41]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[42]

## C.  EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[43]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[44] by determining the most the claimant can still

---

[41]    42 U.S.C. § 1382c(a)(3)(A).

[42]    42 U.S.C. § 1382c(a)(3)(B).

[43]    20 C.F.R. § 404.1520.

[44]    20 C.F.R. § 404.1520(a)(4).

do despite his physical and mental limitations based on all relevant evidence in the record.[45]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[46]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[47]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[48]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[49]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[50]

---

[45]     20 C.F.R. § 404.1545(a)(1).

[46]     20 C.F.R. § 404.1520(e).

[47]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[48]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[49]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[50]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

D.     **THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that although the claimant engaged in substantial gainful activity in the fourth quarter of 2015, there has been a continuous twelve month period during which he did not engage in such activity.[51] This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:   generalized anxiety disorder, major depressive disorder, and a personality disorder.[52]   This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[53]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  "he is limited to simple routine, repetitive tasks with no ongoing public

---

[51]     Rec. Doc. 7-1 at 22.

[52]     Rec. Doc. 7-1 at 22.

[53]     Rec. Doc. 7-1 at 22.

interaction defined as nothing beyond casual and he can have no close coordination with coworkers or supervisors."[54]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[55]  The claimant does not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from December 12, 2014 through April 29, 2016 (the date of the decision) because there are jobs in the national economy that he can perform.[56]  The claimant challenges this finding.

### E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred in failing to properly evaluate the medical opinion evidence, resulting in a residual functional capacity assessment that is not supported by substantial evidence.

### F.    THE ALJ FAILED TO PROPERLY EVALUATE THE MEDICAL OPINION EVIDENCE

The responsibility for determining a claimant's residual functional capacity belongs to the ALJ.[57]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other

---

[54]    Rec. Doc. 7-1 at 24.

[55]    Rec. Doc. 7-1 at 32.

[56]    Rec. Doc. 7-1 at 34.

[57]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

-19-

information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.

This claim was filed before March 27, 2017. Therefore, the medical opinions in the record must be evaluated in accordance with the guidelines set forth in 20 C.F.R. § 404.1527. That statute requires the Commissioner to evaluate every medical opinion received and give a treating physician's opinions controlling weight when they are well-supported and not inconsistent with other substantial evidence in the record.[58] Even when a treating physician's medical opinions are not given controlling weight, the statute requires that they must be weighed in light of the length of treatment, nature and extent of treatment, supportability, consistency, specialization, and any other relevant factors.

In this case, Dr. Dawes is the claimant's treating physician, having provided psychiatric services to the claimant since 2005. Similarly, Dr. LeCorgne was the claimant's treating psychologist at all relevant times. Therefore, their opinions that are well supported and consistent with the evidence in the record should have been afforded controlling weight. The ALJ did not, however, give controlling weight to Dr. Dawes's opinions or to Dr. LeCorgne's opinions; instead, the ALJ gave "little

---

[58]       See, also, *Jones v. Colvin*, 638 Fed. App'x 300, 303 (5th Cir. 2016); *Greenspan v. Shalala*, 38 F.3d at 237; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

weight" to Dr. Dawes's opinions, gave "little weight" to Dr. Friedberg's opinions, and did not assign any weight to Dr. LeCorgne's opinions. Instead, the ALJ gave "significant weight" to the non-examining state agency psychiatric consultant.

The state agency review physician analyzed the claimant's impairments before Dr. Dawes issued the Medical Source Statement in which he evaluated the claimant's functionality and before Dr. Friedberg evaluated the claimant's mental status, but the state examiner did have the benefit of Dr. LeCorgne's analysis of the claimant's functionality. At that time, however, the doctor-patient relationship between Dr. LeCorgne and the claimant was fairly new. While the state examiner found that the claimant's allegations were supported by the medical evidence in the record and credible, he stated that Dr. LeCorgne's opinions were entitled to little weight due to inadequate clinical justification and an inconsistency with the claimant's longitudinal psychiatric history. Those same criticisms cannot be applied to Dr. Dawes's opinions. Dr. Dawes has treated the claimant for over ten years. In addition to scrupulously documenting the claimant's history, reported complaints, and reported reactions to treatment, Dr. Dawes also documented his analyses and diagnoses of the claimant's psychological conditions, his prescription medication regimen, and his recommendations for the claimant's continued treatment. The bases for his

conclusion are set forth in the treatment notes, and he has provided treatment to the claimant over a long period of time.

The ALJ discounted the opinions regarding the claimant's functionality that are set forth in Dr. Dawes's Medical Source Statement because he found it "appears to reflect only a snapshot of the claimant's functioning on the day the form was completed and is not supported by most of Dr. Dawes [sic] other progress notes."[59] To reach that conclusion, the ALJ had to ignore Dr. Dawes's treatment notes, which are less detailed in their analysis of the claimant's functionality than the Medical Source Statement but not inconsistent with the opinions set forth in the Medical Source Statement.  This is in direct contravention to the statutory mandate that the Commissioner give more weight to the opinions of a treating physician whose opinions are supported by the record and not inconsistent with other medical evidence.

In assigning little weight to Dr. Dawes's opinions, the ALJ disregarded Dr. Dawes's lengthy treatment history with the claimant and he also failed to consider the fact that the medical opinions of Dr. Dawes, Dr. Friedberg, and Dr. LeCorgne were all strikingly similar and mutually supporting.  Nevertheless, the ALJ rejected those opinions in favor of the opinions of a physician who did not examine the claimant and

---

[59]    Rec. Doc. 7-1 at 31.

did not have an opportunity to review Dr. Dawes's or Dr. Friedberg's analyses of the claimant's functionality.  This was error.

It seems that the ALJ was swayed by Dr. Dawes's use on several occasions of the word "moderate" to describe the claimant's depression.  In fact, the ALJ found that the claimant had moderate difficulties in social functioning and moderate difficulties in the areas of concentration, persistence, or pace.  But Dr. Dawes's description of the claimant's depression as moderate does not mean that Dr. Dawes was of the opinion that the claimant's depression had only a moderate effect on the claimant's functionality.  In his Medical Source Statement, Dr. Dawes provided a detailed evaluation of the claimant's functionality and explained how, in his opinion, the claimant's moderate depression affected the claimant's ability to, among other things, concentrate, interact socially, and respond to change and stress.  The ALJ's discounting of Dr. Dawes's opinions on those specific aspects of the claimant's functionality because his depression was labeled as moderate on most visits was improper.

The ALJ also found Dr. Dawes's opinions to be internally inconsistent because he opined that the claimant would not be off task 20% of each day but would be off task one day out of every five day work week.  Those opinions are neither inconsistent nor mutually exclusive.  Instead, they reflect Dr. Dawes's opinion that

the claimant's psychological symptoms wax and wane in severity from day to day but do not vary much during each particular day.

One of the reasons the ALJ discounted Dr. Friedberg's opinions was because "it apparently relied heavily on the claimant's self-report of his functional limitation."[60]  This reflects one of the difficulties in evaluating a claimant whose impairments are psychological or mental in nature and, for that reason, cannot easily be defined, quantified, or confirmed by objective testing.  But each of the mental health professionals, with extensive training in their professional fields and many years of experience in treating patients with mental health difficulties, who examined the claimant reached consistent diagnoses of his mental health conditions.  This lends credence to Dr. Dawes's and Dr. LeCorgne's analyses of the claimant's functional capabilities.

The ALJ also found that the claimant's employment history suggested that he was not significantly debilitated.  This discounted the claimant's perception, expressed during his hearing testimony, that his ability to get along with people and to cope effectively with his anxiety and depression has deteriorated with age.  That perception was corroborated by Dr. Friedberg, who opined that the periods of time when the claimant is not functional "seem to be more intense and prolonged as he

---

[60]    Rec. Doc. 7-1 at 32.

-24-

gets older."[61]  Furthermore, the ALJ should not have used the claimant's steady work history against him.  If anything, a long history of steady work should bolster a claimant's credibility when he contends that he is no longer capable of performing the work he did in the past.  Finally, this conclusion by the ALJ fails to take into account the fact that the claimant, although consistently employed for many years, was employed by ten different employers in seventeen years,[62] evidencing his inability to hold any one particular job for a long period of time.

This Court finds that, in weighing the opinions of the various medical sources, the ALJ applied an improper legal standard by placing undue reliance on a non-examining source, which led to findings on residual functional capacity and disability that are not supported by substantial evidence.  This Court further finds that the ALJ should have given controlling weight to the opinions of Dr. Dawes and Dr. LeCorgne—or fully and completely explained why it is not appropriate to do so.  Accordingly, this Court recommends that this matter be remanded for a proper weighing of medical opinions, another evaluation of the claimant's residual functional capacity, and another decision concerning his alleged disability.

---

[61]    Rec. Doc. 7-1 at 337.

[62]    Rec. Doc. 7-1 at 336.

-25-

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to properly evaluate and weigh the medical opinion evidence and to again evaluate the claimant's residual functional capacity.  The claimant should be afforded the opportunity to submit updated medical evidence and to testify at another hearing.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[63]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[63]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[64]

Signed in Lafayette, Louisiana, this 30th day of October 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[64]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

-27-